# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# EXHIBIT 19

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

HENRY DAVIS, DOUGLAS COLEMAN,     )
AARON FILLMORE, JEROME JONES,     )
DESHAWN GARDNER and PERCELL       )
DANSBERRY on behalf of themselves )
and all others similarly situated, )
                                  )
    Plaintiffs,                   )
                                  )
     vs.                          )Case No. 3:16-cv-0600-SCW
                                  )
JOHN BALDWIN, Acting Director     )
of the Illinois Department of     )
Corrections,                      )
                                  )
    Defendant.                    )
_____ )


DEPOSITION OF JOHN BALDWIN

OCTOBER 17, 2018


Joyce D. Lawrence, RPR, CSR No. 84-1716
443563

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 3 of 20    Page
ID #1241

HENRY DAVIS  v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 30

were referencing in your report back in 2016, if you can recall?

A. I do not recall.

Q. Okay. So your report, at least as referenced in Baldwin Deposition Exhibit 2, goes on to say "This is a fundamental change in how IDOC treats offenders in Administrative Detention. We are being sued over this. Don't have much of a defense, but now we do. You have to be in administrative detention for a valid purpose. That is a huge transformational issue for IDOC".

And you go on. But could you explain exactly why you believe this to be a fundamental change in how IDOC treated offenders in administrative detention?

A. It was my belief, when I came here, after seeing some of the time served in administrative detention, which, by the way, is a fall back on my Iowa roots. That's what we called it over there for everything. So the different levels of here, I'm still having to remind myself of our various nuances through the whole process. The -- it was my opinion that we needed to modify our 504 to bring it more in line with where most other states were going and, when

Page 31

I got here, there was a committee working on that. I talked to the committee on several occasions about we need to move the process along and make changes, and then we did that. And this report, looks like a fairly interim kind of report, because it was -- took a long time to get through the legislative process.

But the bottom line is, we needed to make changes and I believe we have made changes to the administrative detention or restrictive housing sections of 504.

Q. Okay. Now, I -- now, I think I understand the disconnect, at least, between me and how I was reading your document. You're using the term administrative detention broadly to refer to all kinds of restrictive housing, and that's because of your roots in Iowa.

A. Right.

Q. Okay. I get it. And whereas, if you look at Rule 504, or what is more formerly known at Part 504 of Title 20, it uses the term administrative detention in a narrower sense. It distinguishes administrative detention from, for example, disciplinary segregation.

A. It does, yes.

Page 32

Q. Okay. But you weren't making that distinction when you wrote the -- you wrote and delivered your report as reflected in Baldwin Deposition Exhibit 2?

A. Correct.

MS. BAUTISTA: Object to the form.

You can answer.

WITNESS: Yes.

MR. ANDERSON: Okay. I got it.

BY MR. ANDERSON:

Q. Now, you -- you reported, according to these notes, or these minutes, that "we are being sued over this. We don't have much of a defense, but now we do".

What lawsuit or lawsuits were you referring to?

A. I do not know which lawsuits I was referring to. I do know, when I came here, we had a myriad of lawsuits and there was several along administrative detention, and so that's why I made that comment.

Q. Okay. So by the time that you delivered this report on or about June 20, 2016, we -- and I'm including myself in that -- had filed the Class Action

Page 33

Complaint for Declaratory Injunctive Relief, about which we're taking your deposition today. I'm going to show you a copy of that.

A. Okay.

Q. And I'll ask the court reporter to mark that as Baldwin Exhibit 4 for identification.

(Baldwin Deposition Exhibit 4, Class Action Complaint for Declaratory Injunctive Relief, was marked for identification)

BY MR. ANDERSON:

Q. So, Mr. Baldwin, Exhibit 4, which you have before you, is a copy of the complaint that we've filed on behalf of the named plaintiffs and you are the named defendant. That was filed on June 2, 2016 in the United States District Court for the Southern District of Illinois. And when I said "we", I included myself. You'll see, I'm listed as one of the counsel itself.

Let me ask you this: Was this -- was this the lawsuit or one of the lawsuits that you were referring to when you gave your report to the IDOC Adult Advisory Board on or about June 20, 2016?

A. I do not know.

Q. Okay. Are you familiar with this

Case 3:16-cv-00600-MAB   Document 174-19   Filed 09/06/19   Page 4 of 20   Page

HENRY DAVIS  v.
JOHN BALDWIN

ID #1242

JOHN BALDWIN
October 17, 2018

Page 34

complaint?

A.  No.

Q.  Okay.  But you were familiar, at least, as of June 20, 2016, that the department had been sued over issues relating to what you would describe as restrictive housing policies and procedures?

A.  I had been told when we came -- when I came here that we had a myriad of lawsuits, and this was included as one of them.  I do not -- I don't have any specific knowledge about which case.

Q.  Okay.  So let's go back to Baldwin Exhibit 4, which is the complaint that -- the Class Action Complaint for Declaratory and Injunctive Relief that we filed on behalf of the named plaintiffs, Henry Davis, et al, versus you, John Baldwin, Acting Director of the Illinois Department of Corrections.  As you sit here today, have you ever read this complaint?

A.  No.

Q.  Have you ever, personally, investigated any of the allegations of the complaint?

A.  No.

Q.  Have you directed -- in your capacity as Acting Director of the Illinois Department of

Page 35

Corrections, have you instructed any of your subordinates to investigate allegations in the complaint?

A.  No.

Q.  Okay.  So let's go back to your -- the report that you gave on June 20, 2016.  And I know it has been a few years, but are the minutes of this meeting, to the best of your knowledge, generally accurate of what you reported to the committee at that time?  I know it's been a long time and there's a couple paragraphs here, but if you could just scan it and tell us whether you see anything that is incorrect, as you sit here today.

A.  I mean, those are summary, you know, sort of minutes taken by somebody.  They would be, I mean -- I think they do a fair job of summarizing.

Q.  Yeah, I'm not trying to trap you into anything.  I just want to -- for my own edification, I wanted to know if this appears to you to be a generally fair summary of what you reported.

A.  Generally fair would be, yes.

Q.  Okay.  Now, as this summary notes, you reported "we are being sued over this.  Don't have much of a defense, but now we do.  You have to be in

Page 36

administrative detention for a valid period".

When you were using the term administrative detention, you were using it in the sense of all types of restrictive housing?

A.  Yes.

Q.  Okay.  And what did you mean by -- when you said that you now have to be in administrative detention for a valid purpose?

A.  Some of the changes to the 504, that we had implemented them, but weren't put in final form until a year later -- we moved some of the ways you could get to restrictive housing now.

Q.  Okay.  And, previously, in your opinion, that was a problem, because there were people in restrictive housing for really what you did not consider to be a valid purpose?

A.  Certainly was -- it was outside of my experience that somebody could get to restrictive housing in that action.

Q.  When you say restrictive housing, that was your experience in Iowa?

A.  Yes.

Q.  And then you came to Illinois and you saw a different situation, where people were in various

Page 37

forms of restrictive housing without an apparent proper purpose, and that's what you were saying from your experience in Iowa?

A.  I talked to several offenders in my, sort of, first year of touring around Illinois.

Q.  Yes.

A.  And some, I felt, were there appropriate, and some I had questions about.  We looked into some of those and that formed the basis of some of my input into the 504 changes.

Q.  Uh-huh.  And so let me ask you more about that.  How would you describe your role in creating and implementing what we've now described as the Rule 504 changes?  What leadership did you provide there?

A.  It was making the people who were writing the 504 when I came aware of the Liman Report.

Q.  Yes.

A.  And as well as some of the issues that I personally was concerned about, in that we have to make sure that somebody gets in restrictive housing for a valid corrections reason.  And so I stressed those topics, and I believe the 504 changes reflect those thoughts.

Q.  Okay.  So you -- you were involved then in

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 5 of 20    Page
ID #1243

HENRY DAVIS v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 42

looked into the one issue, and the person was in there for what I thought was an odd set of circumstances, so we had that looked at. I don't recall the specifics, but they just seemed odd. And I believe, after review, he was removed.

Q. Okay. And what kind of restrictive housing was he in?

A. That I cannot -- I don't remember what kind of housing he was in. I have no idea.

Q. Okay. Well, I want to now get into some of the actual changes that we see in what I'm going to call Rule 504, and you have the department's redline version of it as Baldwin Exhibit 3.

But one of the things that struck me, Mr. Baldwin, that I'm going to ask you about is that I see some changes to the procedures and length of terms that are applicable for what Rule 504 describes as disciplinary segregation, but I don't see them for administrative segregation. So let me, first of all, just ask you about those two terms.

Can you tell us what the differences are between disciplinary segregation on one hand and administrative detention on the other?

A. I would -- I do not know enough to

Page 43

distinguish between those -- how Illinois used those in the past.

Q. Okay. Well, we can -- we can look at it, but there's a clear distinction in Rule 504 and I'm -- I will -- I can show you more specifically, but the sections pertaining to administrative detention appear in Section 504.690. And to help you locate it, there's -- every page is numbered by the department when they produced this. So it would be on page 010906.

A. I'm on that page.

Q. You're on that page, okay.

So the current version of Section 504 describes administrative detention as a "non-disciplinary status of confinement that removes the offender from general population or restricts the individual's access to the general population". And then the section goes on to describe some criteria for putting people in administrative detention.

But, let me just ask you this general question: Is that accurate, that currently, in the Illinois Department of Corrections, that category of administrative detention is a non-disciplinary status of confinement that removes an offender from general

Page 44

population or restricts the individual's access to the general population?

A. I do not know that answer.

Q. Okay. Do you know how many people are currently -- approximately, are in administrative detention, as opposed to disciplinary segregation?

A. I do not.

Q. Do you know how many people currently are in any form of what you've referred to as restrictive housing?

A. I think there's approximately -- 2,860 would be an approximation. 2,860 people are in some form of restrictive housing.

Q. Okay.

A. And that's not accurate, but it's an approximation, based upon what I remember.

Q. It's an estimate, yeah.

A. Yes.

Q. Okay. And I guess, just so everybody is clear, how do you use the term restrictive housing?

A. Anything -- how I use it is, I hope, very close to the way the Liman folks have now changed into restrictive housing, and that is anything that is not normal offender activity, minus hospital stays, jail

Page 45

writs, it's somewhere where the person is some sort of -- is in some sort of restrictive status, and there is various levels of restriction.

Q. Okay. What would those levels be, just by way of example?

A. You might be restricted from going to yard for "X" number of days; you might be restricted from having contact with -- with other offenders because of behavior issues. There's the whole disciplinary side of the thing. There is investigations. There is a myriad of possibilities.

Q. Okay. So another term that we can see that correctional experts and officials use is extreme isolation and --

MS. BAUTISTA: Object to the form.

MR. ANDERSON: Okay. Well, at least let me finish the question, and then you can make your objection, okay? Rather than interrupting the question.

BY MR. ANDERSON:

Q. Another term that we've used in this litigation is the term that is used by other correctional officials and experts. The term is extreme isolation. And that's a term that we actually

Case 3:16-cv-00600-MAB   Document 174-19   Filed 09/06/19   Page 6 of 20   Page
ID #1244

HENRY DAVIS  v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 46

quoted the definition in the complaint, Mr. Baldwin, at Baldwin Deposition 4. Here's your copy.

A.   Okay.

Q.   Here's your copy.

A.   Right.

Q.   So in paragraph 2, quoting some --

A.   Sorry.

Q.   That's okay.

Okay. So in paragraph 2 of the Class Action Complaint, we say "Extreme isolation is a consensus term used by correctional experts, including corrections administrators, to describe segregation from mainstream prisoner population in attached housing units or free-standing facilities, where prisoners are involuntarily confined to their cells for upwards of 22 to 24 hours a day, given only extremely limited or no opportunities for direct or normal social contact with other persons (i.e., contact not mediated by bars, restraints, security glass or screens and the like) and afforded extremely limited, if any, access to meaningful programming of any kind".

So that's the definition that we pulled from the literature and I -- and I -- I get it that

Page 47

the term you're using is restrictive housing. But let me ask you this: Is this term, extreme isolation, one that you've seen used in the correctional literature from time to time?

A.   Rarely used in corrections literature that has -- that is formulated by directors of corrections.

Q.   Okay. And is -- is the condition that we -- that we've defined here as extreme isolation, namely, segregation from mainstream prisoner population -- I'm not going to read it again -- but regardless of what we call it, is that type of segregation ongoing today in, at least, some forms within the Illinois Department of Corrections? Forget the label, I'm just talking about --

A.   Yes, I understand.

Q.   -- conditions.

A.   I am not 100 percent certain of the answer.

Q.   And why is that?

A.   Well, A) I don't see the reports of who is in and who is out, and we are -- part of the effort the last several years have been to move away from 22 to 24 hours. And so I don't know if that's 100

Page 48

percent complete or not yet, but we are trying to move that direction.

Q.   Okay.

A.   Not trying. We are moving it to that direction.

Q.   Yeah, and I'm not trying to quarrel with you, but I have some reports that I can show you where you -- you haven't crossed -- you haven't crossed that goal line yet.

But let me ask you about parts of this. There -- there are -- right now, within the Department of Corrections, there are -- there is restrictive housing where the inmate is segregated from the mainstream prison population in attached housing or free-standing facilities. So just breaking this apart, that's happening right now.

A.   Yes.

Q.   Okay. And the next -- just breaking this down into further pieces. The next piece is where the prisoners are involuntarily confined to their cells for upwards of 22 to 24 hours a day. As you sit here today, you're not sure or not aware of whether that's still going on, but you're trying to move in a direction away from it; is that a fair statement?

Page 49

A.   That would be correct.

Q.   Okay. And then the next part of it is "given only extremely limited or no opportunities for direct or normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass, or screens and the like)". Am I right that that's still going on, but you're trying to move away from those types of conditions?

A.   I believe it is still going on. It would -- yes, and we are moving away from all but the most problematic situations that would endanger life.

Q.   Okay. As opposed to, what, situations where this type of, I'm going to call it isolation, is not justified?

A.   There are offenders in a correction system where restrictive housing is a valid form of keeping that person safe and others.

Q.   Yes.

A.   I believe that. And so that's how I would respond to your question.

Q.   Okay. Well, that certainly makes sense to me, but I'm not a -- I'm not a correctional officer or issue, but I'm taking from your answer that there are

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 7 of 20    Page
ID #1245

HENRY DAVIS  v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 54

504, Chief Administrative Officer, at the very beginning.

MR. ANDERSON: Okay, I appreciate that -- that assistance.  Let's -- let's see if we can find that.

MS. BAUTISTA: It's on page 10881.

MR. ANDERSON: 10881?

MS. BAUTISTA: Uh-huh.

MR. ANDERSON: Okay.

MS. BAUTISTA: You can turn there, too.

WITNESS: It came to me all of a sudden.

BY MR. ANDERSON:

Q.    Okay.  So Ms. Bautista is right.  Although, it still needs clarification from me.

The Section 504.12 defines Chief Administrative Officer as the highest ranking official of a correctional facility.  I don't -- as a lay person, I don't know what that means.  Does that mean the warden?

A.    Yes.

Q.    Okay.  And does that exclude Ms. Funk?

A.    It would.

Q.    Okay.  So in looking at the overall structure of these amended rules, it creates, at

Page 55

least, some procedures for putting somebody in disciplinary segregation, and it has some, I'm going to call it, term limits for various offenses.  But I don't see any of that for administrative segregation.  And if you look in Section 504.609, it doesn't seem to have the same kinds of procedures and restrictions that we see for disciplinary segregation status.  Do you know why that is?

A.    Did you say, I'm sorry, 690 or 609?

Q.    I may have misspoke, but, for the record, it is 504.690.

A.    Okay.

Q.    Thank you.

MS. BAUTISTA: I object to the form.

BY MR. ANDERSON:

Q.    So if you look at subparagraphs A, B and C, you'll correct me if I'm wrong, but for persons that are being placed in administrative status, there is really no notice to the offender.  There is no hearing.  There's no written explanation to the offender.  There doesn't appear to be any appeal or review, and doesn't appear to be any of the procedural due process rights that we can see afforded to persons subject to disciplinary segregation.  Am I right about

Page 56

that?

A.    I do not know.

Q.    Okay.  Well, can we agree that they don't, that none of those what I'm calling procedural due process protections appear to be applicable to persons put in administrative detention, at least under Section 504.690?

MS. BAUTISTA: Object to the form.

WITNESS: I do not know that.  I would have to study the entire document, and I don't -- I have not done that.

BY MR. ANDERSON:

Q.    Okay.  Well, we can -- you can take a look at it maybe further.  But, am I right that this Section 504 of Title 20 -- these are the rules that apply to your facilities state-wide, correct?

A.    Yes.

Q.    Okay.  So it's not just one facility; it's all facilities?

A.    Yes.

Q.    Okay.  Are there other policy and procedure documents that -- that govern the placement of an inmate in administrative detention, other than Rule 504 that we've marked as Baldwin Exhibit 3?

Page 57

A.    I do not know the answer.

Q.    Okay.  And at the various institutions under your supervision and that you visited, are the persons being placed in administrative segregation, basically, being put in the same housing units as those under disciplinary segregation?

A.    I do not know the answer to that.

Q.    Okay.  So this section of 504, 504.690, Subsection D, sheds a little light on that subject.  It says "Living conditions in administrative detention shall meet, at minimum, the standards set forth in Section 504.620".  And those are the standards that are applicable to persons in disciplinary segregation, Mr. Baldwin.

A.    Okay.

Q.    So that seems to indicate that the persons in administrative detention may well be in the same types of restrictive housing as those persons in disciplinary segregation.  And I guess I'll just ask you the question, again:  Do you know one way or the other whether that's a fact?

A.    I do not, no.

Q.    Okay.  And do you know one way or the other whether the persons in administrative detention

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 8 of 20    Page
ID #1246

HENRY DAVIS  v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 62

system was acquired just before I came here.  So that would have been sometime, I believe, in the spring or summer of 2015.  The system has been rebuilt to -- over the last two, two and a half years -- to be more specific for the prison side of the equation.  And it is being loaded into Offender 360, and we're training staff now on how to use it.  Offender 360 is our data management system.  So we are in that process.

Q.    Okay.  So since you've referred to SPIN as a system, I'm taking it, and correct me if I'm wrong, but it is some kind of information technology system?

A.    Yes, sir.

Q.    Okay.  So you have a database and servers and computer systems attendant to this SPIN program?

A.    Yes.

Q.    Okay.  And you say it was required by an act of the legislature?

A.    A risk and needs assessment was required by an act of the legislature.

Q.    And that happened before you became the acting director?

A.    Yes.

Q.    Did the legislature put a time period on

Page 63

when this was supposed to happen?

A.    I don't know that.

Q.    Okay.  In any event, it -- the legislation happened before you arrived at the Illinois Department of Corrections, and it still hasn't been implemented, but you're working on it?

A.    It has been implemented, not state-wide yet.  There are people who have had an assessment done based on the SPIN, and we are continuing to train staff on how to do that.

Q.    Okay.  So you have had some training systems, but have any particular inmates been evaluated under this SPIN program?

A.    Yes, sir.

Q.    Okay.  How many, when and where?

A.    All right.  I do not know.  There's -- I would estimate there has been several thousand who have had the SPIN assessment.

Q.    And what's the basis for that estimate?  Have you seen some reports?

A.    No.  I pop into various meetings about it and I've just heard -- I'm going from memory on those numbers.

Q.    Okay.  And what particular facilities, if

Page 64

you know?

A.    I don't know the exact institutions.

Q.    Okay.  So some of our clients are in segregation facilities in Menard, and we've, obviously, been in contact with them.  Are the residents of the segregation facilities in Menard, have they -- have they been the beneficiary, if we can call it that, of this SPIN program?

A.    I do not know.

Q.    Okay.

A.    Are these people still at Menard?

Q.    Yeah, some of them are.  Yeah, some of the individual clients are.

A.    Okay.

Q.    And we -- we have a couple experts who just toured Menard recently in the last couple of months and they -- they interviewed them and generally viewed the facilities and took some photos.  I can show them to you.

So what is your time table for implementing this SPIN program state-wide?

A.    I don't know what the time table is.

Q.    Okay.

A.    It is ongoing.

Page 65

Q.    And what does this -- sounds like it has been ongoing for quite a while, so that's why I'm wondering whether you have memorialized a point in time where you expect to cross the goal line?

A.    No.

Q.    Okay.  And tell me in more detail what the SPIN program will allow the department to do?

A.    Sure.  I am not the expert in this, so this is a -- this is a high level sort of my understanding.

Q.    That's fair enough.  Fair enough.

A.    The SPIN is supposed to measure what somebody's needs are from a treatment perspective, risks from both a treatment perspective and risks to themselves or others.

Q.    Uh-huh.

A.    And it then creates a document that says this person needs X, Y and Z, and prioritizes what those needs are and the counselor is so informed.

Q.    Okay.

A.    Once it gets implemented, then it will be that counselor's responsibility to start with need one and work down.

Q.    Okay.  Does it set any -- will it set any

Page 66

caps on the total amount of time that someone can spend in restrictive housing?

A.   No.

Q.   So it's not any upper limit of five years or ten years or anything like that?

A.   No.

Q.   And are there any such caps in place now within the Department of Corrections?

A.   I'm not 100 percent certain of how to answer that.

Q.   Okay.  So in the course of discovery, the department has produced some snapshots in time of everybody in segregation, and I can show you a few examples.  I brought them.  But there are some people for -- I'm not criticizing the reason --

A.   Uh-huh.

Q.   -- whether good or bad or justified or not, but there are some people that have been in restrictive housing for years, and they kind of just cycle from disciplinary seg to administrative seg, administrative seg.  So I'm asking you, is there anything in place now that puts a total cap on that?

     MS. BAUTISTA: Object to the form.

BY MR. ANDERSON:

Page 67

Q.   A cap in terms of time?

A.   Not that I am aware of.

Q.   Okay.  And are you generally aware that you do have people in the system that have been in some kind of restrictive housing, either disciplinary segregation or administrative detention, for years on end?

A.   I am aware that there are people in housing for years, yes.

Q.   Yeah, but I'm not -- you said housing. I'm talking about either disciplinary -- either disciplinary housing or administrative detention, those two types of restrictive housing.  You're aware that there are people that have been in those -- in that type of restrictive housing for years, correct?

A.   There are people that have been in restrictive housing status for years, yes.

Q.   Okay.  And is that -- is that a concern of yours as the director and as an experienced correctional professional?

A.   Yes.

Q.   Okay.  And that's one -- I don't want to put words in your mouth, but I'm assuming that's one of the reasons why you are wanting to implement the

Page 68

SPIN program; is that a fair statement?

A.   No.

Q.   Okay.  So what -- what's wrong about that? I would have thought that the SPIN program with individual evaluation would -- would -- might -- could address those individuals who have been in some kind of restrictive housing for years on end; am I wrong about that?

A.   What SPIN is designed to do --

Q.   Yeah.

A.   -- is to give our treatment people and our correctional staff a better idea of the needs of that particular offender, so we can start moving to treating individual offenders visa via a group of offenders.  Now -- and so it will pick up -- it will -- we will get to people in restrictive housing. And that has a way of, hopefully, making some changes there.

Q.   Now, when you say treating SPIN, is the SPIN program directed at inmates with mental health problems?

A.   It's part of that, but it is entire -- everybody coming into Illinois Corrections at reception -- and, right now, we started that at

Page 69

Stateville, and we're seeing how it goes -- will get a SPIN evaluation.

Q.   I see.  So the SPIN program is not directed specifically to people in -- with mental health problems or people in administrative detention or people in disciplinary segregation or in any other kind of restrictive housing.  It's simply -- it is an evaluation -- an individualized evaluation upon reception into the facility.  Do I have it right?

A.   And then that is reviewed periodically during their stay.

Q.   I see.

A.   Because needs change during their stay for some people.

Q.   Uh-huh.  But it's not specifically designed to address the problem or issue of people that are in restrictive housing for years on end?

A.   It's not -- that's correct.

Q.   Okay.  And who is driving the implementation of this SPIN program for you?  Who do you look to --

A.   Gladys Taylor.

Q.   Gladys Taylor, okay.  And she's your assistant director?

Page 70

A. Yes, sir.

Q. And you told me that one of her responsibilities is information technology. So that makes sense; this is an information technology project.

A. Yes.

Q. Is it something that is requiring new funding from the Illinois legislature?

A. No.

Q. Okay. So you have the funding for it?

A. I'm not sure how to answer that.

Q. Huh?

A. I'm not sure how to answer that.

Q. Okay. Well, you said you didn't need new funding, so then I leap to perhaps the incorrect conclusion that you didn't need additional funding, but --

A. One would normally assume that, but this is a very unique environment, and we'll leave that alone.

Q. I understand. Okay. Well, let me ask a different question: Is funding presently an administrative obstacle that you will have to overcome in order to implement SPIN on a state-wide basis?

Page 71

A. No.

Q. Okay. So that's -- that's -- that's good news.

MR. ANDERSON: So we've been going for a while now, and I've got a lot more to cover. But do you want to take a break, or what do you want to do about lunch, Ms. Bautista?

WITNESS: I would love to keep going --

MR. ANDERSON: Okay.

WITNESS: -- after a bathroom break.

MR. ANDERSON: Okay. Let's take a bathroom break.

(At approximately 11:44 a.m., a short recess was taken, after which the following proceedings were conducted at approximately 11:55 a m.:)

BY MR. ANDERSON:

Q. Why don't we get back to the deposition.

A. Oh, darn.

Q. What do you mean, "oh darn"? You thought we were done. I'm sorry. One could hope.

A. Yeah, but I'm ready to go back to the deposition.

Q. Okay. Thank you.

Who was your predecessor who only lasted

Page 72

about six or seven months before they quit? I forgot to ask you that.

A. I can't recall his name off the top of my head.

Q. Okay.

A. I did not know him.

Q. Okay. If we -- I have a few more questions on Rule 504, or what is more formally known as Section 504 of Title 20, and if you could turn to 504.115. I'll see if I can find the page number for you here in a moment.

Okay. It's page -- the last three digits of the page number are 898, if that helps you find it.

A. Got it.

Q. Okay. So Section 504.115 is entitled "Indeterminate and Long-Term Segregation Placement". And the first paragraph made a change that now says "Within six (6) months of placement in segregation", which was earlier defined as disciplinary segregation, and it says "no less than ninety (90) days after the director, or deputy director, shall personally review the placement of offenders in indeterminate disciplinary segregation".

You can read the rest of it. But since

Page 73

the director is called out, I'm going to ask you: Have you been involved in this activity, as the director, of reviewing the placement of offenders in indeterminate disciplinary segregation?

A. No.

Q. Who -- who in your organization, if anyone, does that, if you know?

A. I do not know the answer to that. Sandy Funk, it's under her division. I do not know who does it.

Q. Okay. The regs -- the Section 504.115 calls out a deputy director. I know you said you had an assistant director and executive assistant, but who is the deputy director?

A. I'm not positive what they are referring to here. There are three deputy directors under Sandy Funk, who are in charge of the north, central and southern districts, and that might be what it's referencing, but I'm not positive.

Q. Okay. Ms. Bautista is probably looking at the definitions, which I should, too. So let's see --

MS. BAUTISTA: It's not there.

MR. ANDERSON: I was seeing if deputy director --

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 11 of 20    Page
ID #1249

HENRY DAVIS v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 74

So you see what I'm trying to find out. I'm just trying to find out who in your organization, if anyone, is actually personally reviewing the placement of offenders in indeterminate disciplinary segregation. That's my question.

MS. BAUTISTA: Objection. Asked and answered.

MR. ANDERSON: Yeah.

BY MR. ANDERSON:

Q. So your answer is you're just not sure, or did I hear you wrong?

A. I'm not sure. And I said the deputy director might mean the three under Sandy Funk, who have the north, south and central regions.

Q. Do they have deputy director titles?

A. They do.

Q. Okay. That's probably them. And what are their exact titles, those deputy directors?

A. I do not know.

Q. Okay. And as the director, do you know one way or the other whether the deputy directors are personally reviewing the placement of offenders in indeterminate disciplinary segregation every six (6) months?

Page 75

A. I do not know that.

Q. Okay. And then Section 504.115 goes on to say that "Offenders in indeterminate disciplinary segregation" -- well, I'll read the same thing.

So this review by the director, you, or the deputy directors, applies to offenders in indeterminate segregation or the placement of offenders who have disciplinary segregation terms greater than one year.

So I should ask the additional question: Do you know whether there are deputy directors or other persons reporting to you who are actually reviewing, at least, every six (6) months offenders who have disciplinary segregation terms greater than one year?

A. I do not know.

Q. Okay. And it goes on to say that the "reviews shall include a face-to-face interview of the offender by staff". Do you know whether that is happening?

A. I do not.

Q. Okay. And, again, this isn't questions just for your information. Our information is that it's not really happening, so -- but from your own

Page 76

personal knowledge, you don't know one way or the other?

A. Correct.

Q. Okay. Then it goes on to say -- well, subparagraph B then sets forth some criteria for determining whether to establish a specific segregation release date, and these are determinations for the director or the deputy director to make.

Am I right that you, as the director, even though the regulation says -- calls you out, you're not engaged in that determination?

A. That's correct.

Q. Okay. And if anyone is, it's these deputy directors for the three regions?

A. I'm not positive, but it sounds like it.

Q. Okay. And subparagraph C of Section 504-115 says that "those persons who have disciplinary segregation terms of greater than one year, and those persons who are in the status of indeterminate disciplinary segregation are entitled to a copy of the decision". Do you see that in paragraph C?

A. Yes.

Q. Do you know whether that is happening?

A. I do not know.

Page 77

Q. Okay. Do you know, Mr. Baldwin, approximately how many inmates are in some kind of indeterminate segregation status, as that term is used in Section 504?

A. I do not.

Q. Do you know if there -- if you wanted to find out, is there data that would show that number?

A. I believe so.

Q. Who would you ask, if you wanted -- if you wanted to ask the question? How many people do we have in our facilities that are -- that are in indeterminate segregation status?

A. I would ask Sandy Funk.

Q. Okay. So if you turn to Table A of Section 504, and Table A, by the way, shows up in Bates number 10925. Are you there?

I'll let you look at it, but my understanding, and you can correct me if I'm wrong, is that this is a table setting forth the maximum penalties for various types of disciplinary offenses. So people that are placed in disciplinary segregation can be placed in for the various reasons, and then there are certain time periods.

Do you have the page in front of you?

Page 78

A. I do.

Q. Okay. Are you -- are you familiar with these -- this Table A?

A. I have seen it before.

Q. Okay. So some of the types of offenses have amounts of time, like one year, and some of them say indeterminate segregation.

And so here is my question, and it's a question based on what I've seen from the data: Is there anything in the Department of Corrections rules and regulations that prevents, what I'm going to characterize as stacking -- there may be another word for it -- but stacking of segregation time? And that, I mean, if a person commits a new offense while in segregation, is there anything that governs tacking on additional time in segregation, that kind of stacking, if you know?

A. I do not know.

Q. Okay. And is there anything that prohibits, governs, or constrains the deputy directors from stacking in the sense of, once the person's disciplinary seg time is over, then immediately transferring them into -- into administrative detention?

Page 79

MS. BAUTISTA: I object to foundation.

Go ahead.

WITNESS: I have no idea.

BY MR. ANDERSON:

Q. Okay. Well, we may have a few examples. I'm just going to show it to you and make sure that we all understand the problem that I'm talking about.

Can you show us a few of those reports that look like were produced by the department?

Well, I'll have to look for it in a moment.

All right. I'm just going to show you some examples that we've called from data that the Department of Corrections produced in this case. And let's take a few examples from Menard here for a moment.

What's our next exhibit? Exhibit 5. Good.

(Baldwin Deposition Exhibit 5, data excerpts, was marked for identification)

BY MR. ANDERSON:

Q. Okay. So the documents that you have in front of you are excerpts. We just picked examples out of data that the department produced, and I have

Page 80

the underlying data here. But in summary, these are examples of people -- let's turn to, like, Maurice Wallace. He's on the fourth page. I assume you don't know Mr. Wallace?

A. I do not.

Q. Okay. So Mr. Wallace's records, basically, show that he is -- he's been -- he's been in restrictive housing, either disciplinary segregation or -- basically, disciplinary segregation from, at least, December 27, 2012, through the last time the data was collected, which was September 18, 2018. And these -- and the other examples are representative of individuals who are, basically, in disciplinary segregation for years on end with -- with -- with no relief, and they are also examples of where the inmate seemed to be cycling from, as soon as they get out of disciplinary segregation, they immediately go into administrative detention; and then when that term is over, they go into disciplinary segregation.

And here is my question: As the director, are you aware that that's happening at the various facilities under the -- under the administration of the Illinois Department of Corrections?

Page 81

A. No.

MS. BAUTISTA: Objection. Argumentative.

BY MR. ANDERSON:

Q. Have you looked into it at all?

A. No.

Q. Okay. Well, there is a few Menard examples here. I'm just going to give you a few. We will mark this as Exhibit 6 for identification --

(Baldwin Deposition Exhibit Number 6, list of inmates at Lawrence County, was marked for identification)

BY MR. ANDERSON:

Q. So before you get to that, let's go back to Exhibit 5. Exhibit 5 is a collection of examples for inmates: Thomas Anderson, Denzel Walker, Brandale Blackburn, Maurice Wallace, Keon Lipscomb, Anthony White, and Robert Temple. And I get it that you're not familiar with these individuals or their individual treatment. And I hear you say you haven't seen the underlining records that we have listed here. But I am giving these to you so that, if you choose to investigate this going forward, you have some concrete examples of where we believe people are just being

Page 82

recycled continuously from disciplinary segregation to administrative segregation and back to disciplinary segregation and so on for years, and they're, basically, in the same cell, okay?

MS. BAUTISTA: Object to the form.  Is that a question?

MR. ANDERSON: No, it's a request.  It's a request.

MS. BAUTISTA: Okay, let's --

MR. ANDERSON: He said he's not familiar with it.  I get it, but --

MS. BAUTISTA: Well, let's stick to what is appropriate in a deposition.

MR. ANDERSON: So I'm giving him some examples, where he can look at it, if he wants.

BY MR. ANDERSON:

Q.   Let's look at Exhibit 6.  Exhibit 6 are examples from the prison in Lawrence, Illinois.  One example is for Henry Davis; one example is Aaron Fillmore; one example is Jose Rojas, R-o-j-a-s; another example is Dion Coleman.  And, again, the actual data that you see on these pages, Mr. Baldwin, is extracted from data reports that were produced by the Illinois Department of Corrections.

Page 83

A.   All right.

Q.   Have you had a chance to examine any of this data for these individuals?

A.   No.

Q.   Okay.  This data shows, for these individuals, the same type of thing.  They've been in some kind of restrictive housing for many years.  They don't get out.  They rotate from administrative detention to disciplinary segregation.

For example, you could look at Dion Coleman, the last one there.  Are you aware that that practice is ongoing at Lawrence?

A.   No.

Q.   Okay.  You have never looked into it?

A.   Correct.

Q.   Okay.  Let me show you what we believe is going on at Logan.  I'll ask the court reporter to mark this as Exhibit 7 for identification.

(Baldwin Deposition Exhibit Number 7, list of inmates at Logan Correctional Facility, was marked for identification)

BY MR. ANDERSON:

Q.   Okay.  So this is an example of Logan.  And then, again, this is data extracted from reports

Page 84

that the department produces.  This one is representative of an individual who has been in segregation for a couple of years and has a planned release date of June 20, 2026.

Are you familiar with this individual, Amy Ferguson?

A.   No.

Q.   Are you familiar with situations at Logan -- the correctional facility at Logan, Illinois, where individuals have been, basically, assigned to disciplinary segregation not just for years, but appears that Ms. Ferguson's term is ten years?  Are you aware of that happening?

A.   No.

MS. BAUTISTA: Object to the form.

BY MR. ANDERSON:

Q.   Okay.  Do you have any concerns about -- as a correctional professional, about persons being punished with ten-year terms in disciplinary segregation?

MS. BAUTISTA: Object to the form.

WITNESS: I would have to know the underlying circumstances.

BY MR. ANDERSON:

Page 85

Q.   That's fair.  That's fair.

And you're not aware of the circumstances regarding Amy Ferguson's placement in disciplinary segregation for approximately ten years?

A.   I am not.

Q.   Okay.  And since -- Table A in Section 504, we have been referring as Rule 504, the redline we marked as Baldwin 3, appears to place some caps on -- well, it literally prescribes maximum penalties.

Table A to Section 504, do you have that page 925 in front of you?

A.   Yes.

Q.   Okay.  So suffice to say, Table A doesn't have any ten-year sentences.  Should there be ten-year disciplinary segregation sentences in your facilities under the revised Rule 504?

A.   I would have to better understand these individual cases to answer that question.

Q.   Okay.  Should there be?  I mean, is there any written policy that allows for ten-year sentences that you're aware of?

MS. BAUTISTA: Object to the form.

WITNESS: I'm unaware of any.

BY MR. ANDERSON:

Page 86

Q.   Okay.  Are you aware of any rule or policy that prescribes the maximum penalties for offenders in disciplinary segregation, other than what we're looking at here in Table A to Rule 504?

A.   I'm unaware.

Q.   Okay.  And in -- forgive me if I asked you this before, but I'm going to ask it slightly differently.  I don't see anything in Table A or in Rule 504 that prohibits what I refer to as stacking.  Namely, you could conceivably go through every offense in Table A and stack it up until it gets to ten years.

Is there any policy and procedure that would govern that practice?  Because that's the only thing I can think of that would get you to ten years.

MS. BAUTISTA: Objection.  Asked and answered.

WITNESS: I do not know.

BY MR. ANDERSON:

Q.   Okay.  Fair enough.  Can you think of any other circumstance within the constraints of Table A to Rule 504 that could result in a ten-year disciplinary segregation sentence?

A.   I do not know the answer.

Q.   Okay.  Well, you're the director.  I'm

Page 87

just asking if there is some other way to get to ten years that I'm not seeing in the actual rules.

A.   I don't know.

Q.   Okay.  Fair enough.

Let me ask more of a policy question, based upon your forty-some years in corrections.  Is there -- is there any empirical evidence that multi-year, long-term, consecutive terms of segregation, or, as you put it, restrictive housing, does that accomplish anything from a penological standpoint?

A.   I do not know of any studies on that topic.

Q.   Okay.  Do you have an opinion, based on your long -- your long service in the profession?

A.   My opinion is that, typically, long stays in restrictive housing status are not overly productive.  There are exceptions to that statement, though, that I've seen people A) want to stay there for a variety of reasons and it is -- it is a mixed response from the offender population about restrictive housing.  It has been that way since I've been in corrections.

Q.   What do you mean by that, a mixed

Page 88

response?

A.   Some people -- a certain small segment do very well there and like it.  Others do fine.  Others need out.  And our job, back in my SPIN comment, is to better understand the person before they go in so they can better deal with them when they are in restrictive housing status.

Q.   Okay.  And you are aware, and you can correct me if I'm wrong, but, based on your many years of being a correctional professional and your involvement in the Association of State and Correctional Administrators, you are aware there is quite a bit of correctional literature out there citing potential serious consequences to the mental health and physical health of someone who is detained more or less on an indeterminate basis in isolation, in restrictive housing?

A.   I'm aware of that.

Q.   Okay.  And do you have any quarrels with those findings or those conclusions that long-term placement in restrictive housing can lead to serious adverse effects on the inmate's mental and physical health?

A.   As long as there is a "can" in the

Page 89

sentence, I would agree with that.

Q.   Yeah.  Do you know, Mr. Baldwin, whether or not the changes that we see to Section 504, and in particular the changes to the maximum penalties that we see in Table A of 504, do you know whether those changes have had any material effect on reducing the number of persons actually in disciplinary segregation under your watch as the acting director?

A.   Yes.

Q.   And what do you know?

A.   They are down across the board in all levels of restrictive housing.

Q.   Okay.

A.   And I think if you -- I think the most current Liman report will indicate that.

Q.   Okay.  Can you give me some -- some numbers, at least, to indicate the orders of magnitude?  I realize you may not have the exact numbers, but can you help me out with the orders of magnitude?

A.   Overall, I can give you one number.

Q.   Yeah.

A.   If you, about a third of the way through the newest Liman report, there is a table that lists

Case 3:16-cv-00600-MAB   Document 174-19   Filed 09/06/19   Page 15 of 20   Page
ID #1253

HENRY DAVIS v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 94

A. Yes.

Q. Okay. So you can -- you can go look and see how many people are in each category of restrictive confinement at any particular point in time, if you wanted to?

A. **I believe I can. I haven't compared what your list is and what this data shows, but it's fairly inclusive, from my perspective.**

Q. Well, I can show you some examples of the lists that have been produced to us. But, getting back to Table A, which you have, this table appears to prescribe some maximum penalties for persons in disciplinary segregation, although some of them terms of "indeterminate". Is there any table or other document that prescribes the maximum amount of time for persons in administrative detention?

A. I do not know.

Q. Okay. All right. Let's talk about another section here, 504.620 of Baldwin Exhibit 3. That's entitled "Segregation Standards". That's on page number 010901.

A. I have it.

Q. Okay. So this section, quite literally, sets forth some standards for living conditions in

Page 95

segregation areas. And I don't see anything in this section constraining the practice of double-celling. Is there any rule or regulation in effect at your department now that governs the practice of double-celling persons who are in some kind of restrictive housing?

A. **I was looking at --**

Q. It says --

A. **-- 902A on the top of the page?**

Q. Yeah, it says it shall be permitted.

A. **Permitted by the warden.**

Q. Yeah.

A. **But beyond that, I do not know of any.**

Q. Yeah, yeah. I mean, I saw that. Subparagraph A literally says "double-celling shall be permitted upon performance of the Chief Administrative Officer".

So let's see. Ms. Bautista reminds us that the Chief Administrative Officer is defined as the highest ranking official of a correctional facility. So that means that the warden can double-cell people?

A. **That's the way I read that.**

Q. Okay. And are there any written policies

Page 96

or procedures governing the determination of whether to double-cell somebody in segregation?

A. **I do not know of the answer.**

Q. Okay. For example, are there any restrictions that you're aware of on the size of the cell before double-celling is permitted?

A. **I'm unaware of that answer.**

Q. Okay. Are you aware that, very recently, September 26, 2018, a federal judge in the Southern District of Illinois found that, at least, one instance of double-celling at the Menard North Segregation Facility was unconstitutional?

A. Yes.

Q. Okay. I got a copy of that decision somewhere here. Let me -- let me ask about -- here I have it. Okay.

So we're up to Exhibit 8, now? So we'll mark as Exhibit 8 the Order and Injunction entered in the case of Gregory Turley vs. Jacqueline Lashbrook, No. 08-07-SCW.

(Baldwin Exhibit Number 8, Order & Injunction in the case of Turley -vs- Lashbrook, was marked for identification)

**BY MR. ANDERSON:**

Page 97

Q. Okay. So that's a copy of the decision that the Federal Court issued on 9 -- on September 26, 2018. So I hear you say you were aware of the decision. Have you read this?

A. No.

Q. Okay. Jacqueline Lashbrook, do you know her?

A. Yes.

Q. Let's see. Is she the warden at Menard?

A. Yes.

Q. Okay. So the judge describes in some detail the circumstances under which the plaintiff, Gregory Turley, was housed.

Now, Mr. Turley, according to the decision, was housed in North One at Menard. Are you familiar with that facility?

A. **Yes. I have toured it on an occasion or two, but I'm not deeply familiar with it.**

Q. Okay. What is the North One Cellhouse?

A. **It is -- it's, approximately, a six-hundred-person cellblock in Menard. It's close to the Mississippi River and it -- it is -- it looks like -- it looks like a cellhouse looks.**

Q. Okay. And is it used for persons in

Case 3:16-cv-00600-MAB    Document 174-19    Filed 09/06/19    Page 16 of 20    Page
ID #1254

HENRY DAVIS v.
JOHN BALDWIN

JOHN BALDWIN
October 17, 2018

Page 162

recently. Do you recognize this structure?

A. Yes, I do.

Q. What do you recognize it as?

A. This is one of the outdoor exercise areas for people in restrictive housing status.

Q. Okay. And there appears to be a smaller area opening up into a somewhat larger area with a basketball hoop.

A. Uh-huh.

Q. What's the smaller area for? Is that just an access way --

A. Yes.

Q. -- or is that an actual confined exercise area?

A. No, that is an access way only.

Q. Okay. And then the last and final --

A. I'm sorry, but that actual outdoor space is -- is fairly -- is fairly large.

Q. Yeah.

A. It has very good space.

Q. Do you know the dimensions of it?

A. No, but I was -- when I was up there last, there was multiple offenders playing ball and playing table games. You can see in the corner there on the

Page 163

right. And it's -- I don't know. But it has to be at least 50 by 50, if not larger.

Q. Okay. And is this available to the general population, or restricted population, or what population, if any, uses it, if you know?

A. I don't know for certain.

Q. Okay. And let's look at the next photograph, which is the photograph -- that last one in the group exhibit. It's Bates number 134864. This appears to be another photograph of a cell at Pontiac. Do you recognize this photo as representative of a type of cell used for restrictive housing at Pontiac?

A. Yes.

Q. Okay. And so someone in segregation or administrative detention might be put in a cell like this?

A. Yes.

Q. Do you know the dimensions of this cell?

A. I do not.

Q. Okay. And let's see if I understand correctly. The access to outside light comes entirely through what looks like the grate on the doors that we're looking at; is that correct?

Page 164

A. Yes, correct.

Q. And there aren't any other windows in the cell, right?

A. Not in the cell.

Q. And can you tell anything about the heating or ventilation of this type of cell?

A. I think it all comes through the front.

Q. Okay. When you say through the front, you mean through the grate on the door?

A. The grate on the door.

Q. Okay. Okay. As you are probably aware, there's a Statute -- an Illinois Statute that requires that all new, remodeled and newly designated institutions or facilities shall provide at least 50 square feet of cell room or dormitory or floor space. And I can show you, but you're familiar with it, right?

A. No, I actually was not.

Q. Okay. Well, I'll read it to you. I'll read it on the record. It's actually a Statute. It's 70 -- I'm sorry, 730 ILCS 5/3-7-3. And I can show it to you, but I'll read it to you. It's short. It says "All new, remodeled and newly designated institutions or facilities shall provide at least 50 square feet of

Page 165

cell room or dormitory floor space".

So you weren't aware of the statute?

A. No.

Q. Oh, okay. I was going to ask you what is the department doing now to comply with that. But if you weren't aware of it, then it's not really a fair statement, or not a fair question.

Are you aware that there are restrictive housing cells in use currently at Menard and Pontiac and Stateville that are less than 50 square feet of cell space?

A. Based on that recent court case that we talked about earlier, yes.

Q. Yes. Okay. All right. And I know you told me earlier that you're planning to do -- you may have done some remodeling already, you're planning to do some remodeling, and so as the -- as the department proceeds, will you now keep in mind the statute that I read to you?

A. We are -- we are in the beginning of planning and, yes, when we -- I believe the architects for the state would know that statute.

Q. Okay.

A. So -- and I know the things we are -- we

Page 166

have built in my tenure here are beyond that.

Q.    Okay.  Well, let me ask you this:  While you've been the director, since 2015, have you done any remodeling or built any new facilities at Menard, Stateville or Pontiac that would be captured by this statute?

A.    No.  Oh, I'm sorry, yes.

Q.    Okay.

A.    The Residential Treatment Unit at Menard that's still under construction --

Q.    Uh-huh.

A.    -- would have fallen under that statute.

Q.    Okay.  And that's still under construction?

A.    Yes, sir.

Q.    But, as far as of the other blocks and blocks of restrictive housing cells that you inherited as the director, if they were less than 50 square feet, they are still less than 50 square feet because you haven't remodeled them?

A.    Yes, sir.

Q.    Okay.

Okay.  So we know from the court decision that -- that there are, apparently, cells at Menard

Page 167

that are less than 50 square feet.  Do you know if there are cells that have more than 50 square feet that are used for restrictive housing at Menard?

A.    I don't know that.

Q.    Okay.  Now, I think you -- you used the term before administrative directive.  What's an administrative directive, and do you issue those?  That's a compound question.  What is one, and do you issue them?

A.    The administrative directives, which I thought 504 -- 504, before it became whatever the legal process was, is an administrative directive.  We have volumes of them that govern operations in all of our institutions and on parole.

Q.    Okay.  I would call 504 a state regulation, but that's how I was thinking of it.  But you -- but you may call it a directive, as well.

Okay.  And who -- who issues administrative directives?

A.    They come out of our policy shop.  They are reviewed by the appropriate person in charge.  So, for example, Sandy Funk does all of the institution ones; Gladys Taylor does stuff for her areas, and so forth.

Page 168

Q.    Okay.  And do you get involved in those as the director?

A.    No.

Q.    Why not?

A.    I've done too many in my life, and I'm very happy to delegate that to somebody else.

Q.    Okay.  I understand.  Let's -- let's -- I want to ask you a few more questions about recreation.  We looked at some of the photos and the subject of recreation is actually dealt with in what we've been calling Rule 504.  But if you go back to Baldwin Exhibit 3 and you look at Section 504.670, which is at page 010904, you'll see what the rule says about recreation for persons in segregation status.  So let me know when you're there.

A.    I'm here.

Q.    Okay.  So this -- this says that the Chief Administrative Officer shall determine the number of hours per week offenders in segregation may recreate outside their cells.  So, again, the Chief Administrative Officer would be the warden of each facility?

A.    Correct.

Q.    Okay.  And then it says, and this is new.

Page 169

This became effective in 2017.  This is one of the new additions.  It says "Offenders in segregation status shall be afforded the opportunity to recreate outside their cells a minimum of eight (8) hours per week distributed in increments over no less than two days per week, unless otherwise specified in the Rasho settlement".  Blah, blah.  You can read it.

So here is my question:  Are there any policies or procedures in place for actually tracking how many inmates are actually out of their cells for at least eight (8) hours a week?

A.    I know, for mental health, the answer is yes.  And I'm not 100 percent positive of the other.  I believe they are, but I'm not 100 percent positive.

Q.    Okay.  And as the term recreate is used, it says "recreate to outside their cells", that -- that may mean being placed in one of enclosed cages that we saw in the pictures, the photos?

A.    Of the outside areas?

Q.    Yes.

A.    Yes, outside pens, exercise pens.

Q.    You call them pens?

A.    I do.

Page 190

Q. So did Sarah Sullivan describe to you the nature of the work that Vera Institute did for the Illinois Department of Corrections in 2012?

**A.   I don't recall that particular conversation.  It was -- what I remember is it was more about making sure that I knew that Vera had come out to Illinois.**

Q.   Yeah.  And you have had some discussions with Vera Institute about re-engaging them during your tenure as the assistant director; am I right about that?

**A.   We did have some very, very preliminary discussions, yes.**

Q.   Okay.  And what was the nature of those discussions?

**A.   Sarah approached me about coming out and revisiting the whole Vera report, and I decided to work with the Liman group.  I liked the Liman report.**

Q.   When you say Liman report, is that what we've referred to as -- well, there's two of them now.  But we looked at earlier the report jointly authored by the Association of State Correctional Administrators and the Arthur Liman Program.  So is

Page 191

that what you mean?

**A.   Yes, sir.**

Q.   That's the same organization?

**A.   Yes.**

Q.   And when you said you liked the report, you were referencing the report that we marked as Baldwin Exhibit 1 for identification?

**A.   I believe that's true.**

Q.   Okay.  And so that's why you -- you liked that report and that's why you decided you would work with that one instead of Vera?

**A.   Yes.**

Q.   Okay.  All right.

Okay.  So we have some of the documents from the Vera study.  I'm going to walk you through those.  I think I have them here.

Before I get there, what is our next exhibit number, 13?  So let's mark this next page as Exhibit 13.

(Baldwin Deposition Exhibit Number 13, 730 ILCS 5/3-7-3, was marked for identification)

BY MR. ANDERSON

Q.   So, Director Baldwin, earlier today, I referenced the Illinois Statute 730 ILCS 5/3-7-3.

Page 192

That's the one that sets out the requirements of at least 50 square feet of cell space for remodel and new.

So this is just more a point of your own reference.  If you would like a copy of it, you can have this extra copy to take with you.  And I wanted to mark it, so we could identify for the record what I was talking about and confirm that you really haven't seen that statute before today.

**A.   Correct.**

Q.   Okay.  And so now, let's look at a few of these Vera documents.  So we'll ask the court reporter to mark this as Exhibit 15, this document entitled "Segregation Study - Illinois Department of Corrections, June 4, 2010 Exit Meeting".

Exhibit 14, all right.

(Baldwin Deposition Exhibit Number 14, Segregation Study - Illinois Department of Corrections, June 4, 2010 Exit Meeting, was marked for identification)

**BY MR. ANDERSON:**

Q.   So, Mr. Baldwin, you have in front of you Exhibit 14.  I've described it on the record and this was produced by the Vera Institute.  You can see that

Page 193

from the Bates number on the lower right side and -- and we've had some testimony about it already.  But it appears to be a document entitled Segregation Study - Exit Meeting.

So the first question of you is:  Is this one of the Vera documents that you've seen?

**A.   No.**

Q.   Okay.  And page 3 has Vera Institute's preliminary recommendations, 1 through 6, and then the next steps, 1 through 5.  Have these Vera recommendations been described to you at some point in time during your tenure as Director of the Department of Corrections?

**A.   I don't recall any of these, specifically, being discussed.  I'm trying to glance through them hurriedly.**

Q.   Well, if you haven't seen it, you haven't seen it.

Okay.  I'll mark another one, and I will ask you if you recognize it.  This next one will be Exhibit 15 for identification.

(Baldwin Deposition Exhibit Number 15, Segregation Study - Illinois Department of Corrections, July 30, 2010 Exit Meeting, was marked

Page 194

for identification)

BY MR. ANDERSON:

Q.  Okay.  So, Mr. Baldwin, this document we've marked as Baldwin Exhibit 15 for identification.  Deposition Exhibit 15 for identification, this was another document that was produced by Vera Institute.  It is entitled "Segregation Study - Illinois Department of Corrections, July 30, 2010 Exit Meeting".  You can see that it has some major findings and recommendations.

So my first question is:  Are you familiar with this document?

A.  No, sir.

Q.  You have never seen it before?

A.  Never.

Q.  None of your staff ever presented it to you?

A.  No.  I'm not aware of it.

Q.  Okay.  And have the major findings of the Vera Institute as set forth in the document ever been described to you?

A.  No, sir.

Q.  In other words, when you came on the job, did anybody bother to tell you that one of their

Page 195

findings, number one, was that "The current system of disciplinary segregation is excessive with respect to the use and duration of disciplinary seg"?

A.  No.

Q.  Okay.  So let me ask you a related question.  When you came on the job in 2015, would you agree with the Vera Institute's characterization that the current system of disciplinary segregation is excessive with respect to the use and duration of disciplinary segregation?

MS. BAUTISTA:  Object to the form.

WITNESS:  I do not have enough knowledge to make that assumption.

BY MR. ANDERSON:

Q.  Okay.  Well, maybe not on day one, but --

A.  No.

Q.  -- as you toured the systems and as you learned the facilities over the next 12 months, did you reach the same conclusion that the Vera Institute apparently did, that the "current system of disciplinary segregation is excessive with respect to the use and duration of disciplinary segregation"?

A.  The 504 changes had just started when I showed up, the drafting of them.

Page 196

Q.  Yeah, the drafting, okay.

A.  And after they got somewhat farther down the path, I became involved in those a bit and modified a lot of the length of time that was served to what it is today.  And so, yes, I had some concerns that we were keeping people too long in various statuses.  And not just restrictive housing status, in a variety of statuses besides restrictive housing.

Q.  So what other statuses were you keeping people too long, as you say?

A.  Like, how long do you stay in C grade?  How long do you stay in B grade?  How do you work your way out of maximum?  Variety of -- some of those I discovered are legislative, which did surprise me.

Q.  All right.  So I hear you saying, when you arrived, you shared some of the concerns articulated by the Vera Institute, and you started working and you're still working to resolve those concerns; is that a fair statement?

A.  After skimming these two documents, that is a fair statement, but I had not seen them prior to this conversation.

Q.  Okay.  So their number two major finding is "Overall, the current system is based predominantly

Page 197

on punishment and degraded conditions of confinement", which assumes that current levels of punishment are deterring subsequent behavior.  Do you have any reason to disagree with that major finding by Vera Institute, based on your personal observations?

A.  My personal observation is the current system is based predominantly on punishment, which assumes that current levels of punishment are deterring subsequent behavior is an accurate statement.  I do not -- do not -- I would not support the degraded conditions of confinement portion.

Q.  I didn't really follow you.  I gather you're quarreling with a portion of the sentence that says --

A.  I would.  I would.

Q.  Let me just restate it:  The Vera Institute found what they found, Number 2 there.  I won't read it again.

A.  Uh-huh.

Q.  Tell us what parts of it, if any, you agree with and disagree with?

A.  I agree with their finding that, in my first six months, that our system was based predominantly on punishment --

Page 206

MR. ANDERSON: Oh, veteran --

MS. BAUTISTA: Correctional officer.

BY MR. ANDERSON:

Q.    Okay.  Is that not a fair statement?

A.    **That's not a fair statement.**

Q.    Okay.  I'm sorry.  I didn't mean to be --

A.    **That's all right.**

Q.    I would -- okay, so --

A.    **How about a veteran corrections employee?**

Q.    Veteran corrections employee, okay.  All I meant -- all I meant by that was that you are very experienced in the field of corrections and leadership of correctional institute.  That's all I meant.

A.    **I understand.  I just wanted --**

Q.    I mean, that's my personal observation.  I didn't mean to suggest anything else.

And you do wear a badge, so --

A.    **I do.  We all do, though.**

Q.    So -- so just let me see if there is anything else we need to cover here.

Okay.  Let's look at the next one.

All right.  So we're up to 16.  Let me show you the next document.  We'll ask the court reporter to mark it Baldwin Exhibit 16 for

Page 207

identification.

(Baldwin Deposition Exhibit Number 16, Segregation Policy Checklist for Illinois Department of Corrections, Vera recommendations, January, 2011, was marked for identification)

BY MR. ANDERSON:

Q.    So this is a document entitled Segregation Policy Checklist for Illinois Department of Corrections, Vera recommendations, January, 2011.

This is a document that was produced to us by the Vera Institute.  And, according to the testimony we've received, was provided to the Illinois Department of Corrections.  So here is my first question to you:  Have you seen this one before?

A.    **No.**

Q.    Hmm.  When you became the acting director of the Illinois Department of Corrections in 2015, didn't anybody come to you and say "Boy, we had all of our segregation policies studied a few years ago by the Vera Institute and here's the file"?

A.    **No.**

Q.    Okay.  Well, you know, did you know Gladys Taylor, for example, was involved in this -- actively involved in this Vera study and receiving the

Page 208

recommendations?

A.    **I don't know who was part of the Vera.**

Q.    Okay.  Have you -- have you ever asked Vera, where's our file on the -- I mean, have you ever asked Ms. Taylor, where is the file on the Vera recommendations?

A.    **No.**

Q.    And she has never volunteered that Vera provided a rather extensive study and recommendations?

A.    **I don't recall that, specifically.  I had been told Vera did do some work.  I'm sure Gladys was part of the conversation.  I don't remember the specific roles.**

Q.    Uh-huh.  And I forgot, who did you tell me told you about the Vera study?

A.    **Mike Atchison.**

Q.    Mike Atchison, okay.  And did you say -- well, if somebody -- let me ask you this:  You consider the Vera Institute to be an experienced organization in terms of -- in terms of analyzing and making recommendations in the field of corrections, right?

A.    **Yes.**

Page 209

Q.    Okay.  So if Mr. Atchison told you about it, did you say, well, I certainly would like to see the recommendations?

A.    **No.  I went down the path of that Liman report.**

Q.    I see.

A.    **I was looking at it from a much more systemic point of view, and I think the Liman is a much better corrections document than anything I've seen about restrictive housing.**

Q.    Okay.  So the Liman report, though, is not specific to the Illinois Department of Corrections?

A.    **It is not.**

Q.    Okay.  Whereas, the Vera Institute did an analysis and prepared recommendations specific to the Illinois Department of Corrections?

A.    **Yes.**

Q.    Okay.  But you never asked to see those?

A.    **Correct.**

MS. BAUTISTA: Objection.  Asked and answered.

BY MR. ANDERSON:

Q.    So let's look at Baldwin 16 for a moment.

You can see their recommendations here.